Vincent **REILLY,** Plaintiff,

v.

**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, AFL–CIO and Sheet Metal Workers' International Association Local Union No. 137, Defendants.**

**No. 78 Civ. 2505 (VLB).**

United States District Court, S. D. New York.

March 31, 1980.

Steven Thaler, New York City, for plaintiff.

Cohen, Weiss & Simon, New York City, Donald Fisher Co., L. P. A., Toledo, Ohio, for defendant Sheet Metal Workers' Intern. Ass'n, AFL–CIO.

Levin & Weissman, P. C., New York City, for defendant Sheet Metal Workers' International Association, Local Union No. 137.

OPINION

VINCENT L. BRODERICK, District Judge.

I.

The plaintiff, a member of Local Union No. 137 of the Sheet Metal Workers International Association, brought this action against the International and the Local under the Labor-Management Reporting and Disclosure Act of 1959 ("the Act"), 29 U.S.C. § 401 *et seq.*, alleging that the union disciplined him in violation of the due process requirements of the Act, 29 U.S.C. § 411(a)(5). A bench trial was held on February 22 and 26, 1980.

II.

The following constitute my findings of fact in this case.

On or about June 30, 1977, plaintiff Reilly, a member in good standing of the union, became involved in an altercation with the acting financial secretary of the Local, Bernard Friedland, at a jobsite located at the World Trade Center in New York City. For reasons set forth in the discussion which follows, I find it unnecessary to make any detailed findings concerning the events which took place. It is undisputed, however, that Reilly hit Friedland and knocked him unconscious. Friedland suffered a concussion, was confined to bed for 24 hours, and underwent extensive dental treatment thereafter.

Sometime prior to the this incident, Reilly had notified the Local that he had problems receiving mail at his home address, and had asked that correspondence from the union be mailed to him at his employer's address. That request was communicated to the recording secretary of the Local, Richard Greenberg. In early 1977, union correspondence had been directed to Reilly through his employer, as requested.

By letter dated August 17, 1977, Friedland preferred charges of misconduct against Reilly; he alleged that the physical injury inflicted on him violated two specified provisions of the International's constitution. That letter was sent by certified mail to Reilly's home address on August 17. After three unsuccessful attempts to deliver, the post office returned the letter to Friedland at the Local's business office on September 4. Friedland was aware of the fact that the letter had not reached Reilly, but made no further attempts to serve him with it.

On September 12, the Local's recording secretary Greenberg addressed a letter to Reilly notifying him that a trial on Friedland's charges had been scheduled for September 27. One copy of that letter was sent certified mail to Reilly's home address and was returned unclaimed. A second copy was mailed to Reilly's employer, who signed a receipt for its delivery on September 18.

On about September 17 the Local's business agent, Gerry Gieseking, approached Reilly while he was on the job and notified him of the upcoming trial. Reilly, who

continued with his work while the conversation was taking place, learned only that a trial would take place and that he, Reilly, was "in trouble" as a result of the charges being pressed. Gieseking did not tell him anything about the procedure to be followed or his rights at trial.

The trial on Friedland's charges took place before a trial committee of Local 137. Both Friedland and Reilly attended. The Chairman read the Local's guidelines for conducting trials to all present. Reilly requested a postponement of the proceedings on the grounds that he was not prepared, and that request was denied. Friedland then testified that Reilly had struck him without apparent provocation and that he had not struck Reilly at all. Reilly testified that Friedland struck him first, and that he had struck back in self-defense. Friedland called three other witnesses who testified that they saw Reilly strike Friedland and did not see Friedland strike Reilly. Reilly called no witnesses.

The trial committee thereafter issued a decision finding Reilly guilty as charged. In accordance with the International's constitution, that decision was submitted for approval by majority vote of the Local's members attending the next regular union meeting. The membership rejected the trial committee's decision by a vote of 33 to 17, in effect exonerating Reilly. A copy of a letter notifying Reilly of this action, together with a copy of the minutes of the trial,[1] was mailed to Reilly by certified mail at his home address on October 25 and returned to the local unclaimed on November 12. Greenberg received the undelivered envelope and relegated it, unopened, to his files. He made no attempt to serve Reilly with the envelope or with another copy of the minutes at any of the succeeding regular monthly union meetings which both Greenberg and Reilly attended.

On October 28, Friedland appealed the membership decision to the General President of the International and sent a copy of his letter appeal to Reilly by certified mail to his home address. Reilly received that letter. He was not informed of his right to or the procedures for opposing that appeal, nor of his right to receive a copy of the minutes. On January 6, 1978 the General President reversed the decision of the membership, reinstated the decision of the trial committee and imposed the additional penalty on Reilly of three months suspension from membership. On March 23, 1979, his decision was affirmed by the General Executive Council of the International.[2]

### III.

For the reasons which follow, I hold that the defendants violated Reilly's due process rights. Accordingly, I vacate the penalties imposed on him by the General Executive Council and remand to the Local for a new trial.

### IV.

The plaintiff has attacked the union's judgment against him on a variety of grounds. At the outset I dispose of those challenges which I do not find persuasive.

■ At trial before me, the plaintiff testified to his version of the incident for which he was tried and penalized by the union. I admitted that testimony over de-

---

1. The trials are not recorded by the union. Summary minutes are kept.

2. At trial before me a great deal of evidence was introduced of the circumstances surrounding Reilly's appeal to the General Executive Council. Most of that evidence appeared to be relevant primarily to the question of the timeliness of that appeal and to an earlier motion in this action for attorneys' fees which was denied without prejudice to renewal. Since the General Executive Council agreed to accept the appeal and its timeliness has not been challenged by the union in this proceeding, that issue is not before me. This evidence also tends to establish some foot dragging on the part of the union in providing Reilly with the minutes of the trial and in according him the membership rights to which he was entitled pending his appeal. Since these defects were ultimately cured, they do not raise issues of due process for this court's resolution. They do, however, cast doubt on the union's good faith in its earlier attempts to provide Reilly with notice and with the minutes necessary to resist Friedland's appeal.

fendants' objections but made it clear that it was admitted solely for whatever bearing it might have on the issue of due process violations. The Supreme Court has held that the district court in reviewing the evidence is limited to a determination that the decision is supported by "some evidence." *International Brotherhood of Boilermakers v. Hardeman*, 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971). In this case the trial committee had before it not only Friedland's own version of the incident, but also the testimony of three witnesses who to a limited extent corroborated his account. On the record before me, then, the charges were adequately supported by the evidence.

■ The plaintiff maintains that under the union constitution Friedland had no right to appeal from a decision of the Local's membership and the General President had no authority to increase the penalty. As defendants have noted, the plaintiff failed to raise these issues before the General Executive Council and has therefore failed to exhaust his union remedies with respect to those issues. *See* 29 U.S.C. § 411(a)(4). The district courts will defer to any reasonable interpretation of union rules by union officials. *Vestal v. Hoffa*, 451 F.2d 706 (6th Cir. 1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1768, 32 L.Ed.2d 135 (1972); *English v. Cunningham*, 282 F.2d 848 (D.C.Cir.1960). It follows that union officials must be given a reasonable opportunity to interpret the rules.

■ Finally, plaintiff alleged and tried to establish at trial, that a potential witness for the plaintiff, a Local member named Kenneth Olsen, who witnessed the altercation, was discouraged by Local officials from testifying at Reilly's trial. I find this charge simply not borne out by the evidence. Olsen testified without contradiction that he spoke to the union business agent by telephone from his home 15 minutes before the trial was scheduled to begin and was told not to attend. That testimony would be as consonant with a finding that the union tried, but was too late, to secure Olsen's attendance as it would be with a finding that an eleventh hour attempt was made to ensure his absence.[3]

## V.

■ The plaintiff has established violations of his rights under Section 101(a)(5) of the Act, which provides:

(5) Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

29 U.S.C. § 411(a)(5)

The legislative intent in enacting these provisions was to ensure due process and "basic fairness" in union disciplinary proceedings. *International Brotherhood of Boilermakers v. Hardeman*, 401 U.S. at 242, 91 S.Ct. at 615; *Gleason v. Chain Service Restaurant*, 300 F.Supp. 1241, 1251 (S.D.N.Y.1969), *aff'd* 422 F.2d 342 (2d Cir. 1970) (per curiam).

---

3. Olsen further testified that shortly after he signed an affidavit which was attached to Reilly's union appeal, Local business agent Gerry Gieseking appeared at his shop and asked him if he realized what he was saying in the affidavit. The next day Olsen was laid off by his employer. The defendants effectively rebutted the inference of union retribution by eliciting the testimony of Olsen's then employer. The employer testified that Olsen was not a full-time regular employee, that he was hired to perform a specific job, and that he was terminated because that job had been performed. He denied having any discussions with union officials regarding Olsen's termination. Even if plaintiff were able to establish that the union was responsible for Olsen's lay off, he has not established any resulting prejudice to his own due process rights. The lay off occurred well after the trial and after Olsen signed an affidavit very helpful to the plaintiff. His willingness to testify at the trial of this case was clearly not affected by the action.

The first violation alleged by plaintiff is the union Local's failure to provide him with "written specific charges" as required by the Act. It is undisputed that written charges were sent to Reilly by certified mail and that he never received them.

It is a fundamental precept of constitutional law and civil procedure that every defendant to a civil action must be notified by means which are "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* at 315, 70 S.Ct. at 657. Since the purpose of the Act's notice requirement is to facilitate the preparation of a defense, "basic fairness" and common sense would seem to require that the union be held to the same standard.

The union contends that service of charges by certified mail, as required by its constitution, is the method best designed to ensure actual notice. As a general proposition, I would be inclined to agree. In this case, however, the union had every reason to know that delivery by certified mail to his home address was the worst possible way of serving notice on Vincent Reilly. Not only was the union Local on notice prior to the mailing of the charges that mail should be addressed to Reilly in care of his employer, but it was put on further notice by the return of the August 17th charge letter.[4] That the Local had the ad-

dress of Reilly's employer and was aware of the likelihood that mail addressed to him there would be received is evidenced by its subsequent decision to mail to him in care of his employer the September 12 letter notifying him of the trial date. Friedland testified before me that he was aware that Reilly had not received the charge letter, that he made no further attempt, and had no desire, to see that Reilly received it, that he was concerned only with complying with the letter of the constitution's requirements. Literal compliance with its own rules will not shield the union from the overriding requirements of the Act.[5] 29 U.S.C. § 411(a)(5), (b).

While it is undisputed that Reilly received notice of the trial date and appeared at the proper time and place, that notice did not satisfy the requirement of the Act that "written specific charges" be served on the accused. That provision has been construed to require a description of "the nature of the offense, the circumstances surrounding the alleged infraction and, as nearly as may reasonably be ascertained, the time and place of the occurrence," *Berg v. Watson*, 417 F.Supp. 806 (S.D.N.Y.1976). The notice received by Reilly did no more than identify his accuser and the time and place of trial.

Gieseking's conversation with Reilly did not cure the deficiency in the written notice. The Act unambiguously requires that charges be preferred in writing. The plaintiff's uncontradicted testimony establishes that Gieseking approached him on the job at a time when he was unable to focus his attention on the conversation, and that the

4. The defendants have suggested that under the union constitution it was Friedland's responsibility as the complaining party, and not the Local's, to serve notice on Reilly. There is no evidence that Friedland personally knew that Reilly should be notified through his employer. The Act, however, quite clearly places on the union the onus of ensuring that written charges are served on the accused, union rules to the contrary notwithstanding. 29 U.S.C. § 411(a)(5), (b).

5. *Freed v. Plastic Packaging Materials Inc.*, 66 F.R.D. 550 (E.D.Pa.1975), cited by the defendants, is inapposite. It stands for the proposi-

tion that service by mail of litigation papers on a *pro se* party is an adequate form of service under the Federal Rules of Civil Procedure even if they are never received. The court held, in effect, that it was the obligation of the parties to keep other parties and the court informed of address changes which occurred during the course of litigation. In this case, Reilly had no reason to know that he would be the addressee of "litigation" documents prior to the initiation of proceedings. Moreover, he had identified for the union a preferred alternative address at which he could be reached.

only thing he remembers being told is that a trial would take place on September 27. Such testimony demonstrates the wisdom of the Act's requirement of written notice. Had such notice been served there would have been no question concerning the nature of the information communicated and the opportunity to formulate a defense.

■ Of course, it cannot seriously be contended that Reilly was unaware of the basic nature of Friedland's charges against him when he went to trial. The independent knowledge of the accused concerning the circumstances of his own alleged wrongdoing, however, will not excuse the defendant's failure to comply with the requirements of the Act. *Gleason v. Chain Service Restaurant, supra* at 1253 (per curiam); *Berg v. Watson, supra,* at 811. Reilly would have had no way of anticipating with any precision Friedland's version of the facts nor the identity of the violations with which he had been charged.

Closely related to the failure to serve written specific charges is the union's failure timely to inform Reilly of the procedures by which he might defend against those charges. While the Act does not in so many words require that the union inform the accused of the trial procedure to be followed and of his rights under that procedure, such a requirement is surely implicit in the requirements that the accused be "given a reasonable time to prepare his defense" and that he be "afforded a full and fair hearing." The right to a "full and fair hearing" includes, *inter alia*, the right to call witnesses, *Yochim v. Caputo*, 46 CCH Lab. Cas. ¶ 17,894 (S.D.N.Y.1962) and the right to cross-examine adverse witnesses, *Allen v. International Alliance of Theatrical Stage Employees*, 338 F.2d 309, 317 (5th Cir. 1964); *Yochim, supra*; Etelson and Smith, Union Discipline Under the Landrum Griffin Act, 82 Harv.L.Rev. 727, 745–46 (1969). Such rights are meaningless unless the accused is given an opportunity to prepare himself to exercise them intelligently.

■ The chairman's reading of the trial guidelines at the commencement of the trial constituted Reilly's first exposure to the procedures. By that time it was too late for him to exercise his right to call witnesses on his behalf, or to prepare to confront adverse witnesses, and his request for an adjournment was denied. I do not suggest that the union is under a statutory obligation to brief the accused in advance of trial on every aspect of trial procedure, nor to help him conduct his defense. At a minimum, however, due process does require that the accused be told, far enough in advance of trial to be of some use to him, that he has a right to call witnesses, that his adversary may call witnesses, that he has a right to cross-examine them, and that he runs the risk of incurring serious penalties.

This notice requirement is not a formality devoid of substance; knowledge of trial-type procedures, which lawyers take for granted, is vital not only in the preparation of a defense but in alerting the accused to the nature of the proceedings being mounted against him. This plaintiff testified that he was completely surprised by the scene he encountered upon walking into the offices of the Local on the evening of September 27. He had expected no more than a private "talking to" or slap on the hand by union officials; instead he found a tribunal ready to sit in judgment on his acts and a panoply of witnesses to testify against him. Such surprise could easily have been avoided had any attempt been made to educate him against the event.

■ Had the decision of the membership, reversing the trial committee, been allowed to stand, all these due process violations would have been cured. Friedland's appeal, however, put Reilly once again in jeopardy by creating the risk that the trial committee's decision would be reinstated. Thus the appeal triggered once again the due process requirements of the Act.

The reasonable opportunity to prepare a defense which the Act protects would require at a minimum that the accused receive that account of the proceeding on which the appellate decision will be based and that he understand his right to oppose

the appeal and the procedure for doing so. While Reilly did receive a copy of Friedland's letter of appeal, that is all the information he received. Ignoring its past experience in mailing documents to Reilly, the Local chose to serve Reilly with the minutes by the one method which had proved consistently unsuccessful. When the mail was returned recording secretary Greenberg declined to take advantage of a previously successful method by mailing it to Reilly's employer. Nor did Greenberg trouble himself to hand the minutes to Reilly at any of the monthly union meetings they both regularly attended. While the union's initial failure to serve Reilly with Friedland's charges may be attributed to laziness or inattention, its persistent failure to deliver essential documents by known and effective methods smacks of bad faith.

Once apprised of Friedland's appeal, of course, Reilly could theoretically have requested from the union a copy of the minutes and additional information concerning his rights on appeal. That argument, however, presupposes that Reilly had reason to suspect the existence of such rights—an assumption which appears unwarranted in light of the profound ignorance in which the defendants had left him. It is to foreclose such "bootstrap" arguments that the courts have placed the burden of providing due process on the accusers rather than the accused. Cf. *Gulickson v. Forest*, 290 F.Supp. 457, 467 (E.D.N.Y.1968).

The defendant International has urged, relying on *Rosario v. Amalgamated Ladies' Garment Cutters' Union*, 605 F.2d 1228 (2d Cir. 1979) that any due process violations committed by the Local at the trial level were cured on the appeal to the General Executive Council. The International suggests that the only prejudice the plaintiff has been able to identify is his inability to call Kenneth Olsen on his behalf. Since Olsen's affidavit was offered on appeal and considered by the General Executive Council, it reasons, that prejudice was completely cured on appeal.

The *Rosario* decision does not and could not reasonably stand for the proposition advanced by the International. In *Rosario* the Union Appeals Committee agreed to conduct a *de novo* proceeding against the plaintiffs—a new hearing at which testimony would be heard and documents presented. Accordingly, the Court of Appeals held that due process violations which affected the fairness of earlier hearings had been cured. In the case at bar, the International's General Executive Council limited its review to the record below, and to the documents attached to the appeal; indeed its power appears to be limited by the constitution to that form of review.

The consideration by the General Executive Council of the Olsen affidavit did not cure the due process violations committed by the Local. It is unlikely that the General Executive Council attached as much weight to the documentary evidence as it did to the live testimony before the trial committee, which had been subject to a form of cross-examination. Undoubtedly the decision of the trial committee, which was based on that testimony alone, was accorded substantial weight. In addition, the failure to call Olsen cannot be accepted as the only prejudice suffered by this plaintiff; assuming he would have had no other witnesses to call, his own testimony and cross-examination would have been more thorough and more sharply focused had he been prepared for the proceeding.[6]

SO ORDERED.

---

6. Defendant Local has made the analogous argument that any due process violations committed by it were cured by the membership vote reversing the trial committee's recommendation which constituted the final action taken by the Local on Reilly's case. As I indicated at trial, I find this argument disingenuous. The

only record before the General President on appeal was the minutes of the Local's trial—a record tainted by the due process violations. His decision, upheld on further appeal, was in effect a reinstatement of the trial committee's decision.