**Earl STROM**

v.

**NATIONAL ASSOCIATION OF BASKETBALL REFEREES.**

**Civ. A. No. 82–1556.**

United States District Court, E.D. Pennsylvania.

May 13, 1983.

Richard H. Markowitz, Philadelphia, Pa., for plaintiff.

Patrick T. Ryan, Mark M. Wilcox, Philadelphia, Pa., for Nat. Ass'n of Basketball Referees.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

Plaintiff, Earl Strom, a basketball referee and member of defendant, National Association of Basketball Referees ("NABR" or the "Association"), has filed a complaint alleging that certain discipline imposed by the Association was in violation of sections 101(a)(2) and 101(a)(5) of the Labor-Management Reporting and Disclosure Act ("LMRDA" or the "Act"), 29 U.S.C. § 411(a)(2), (a)(5). Before the court is plaintiff's motion for summary judgment which shall be granted.

## I. FACTS

On November 28, 1979, Strom was refereeing a basketball game in Boston, Massachusetts. His refereeing partner for that game was Richard Bavetta. During halftime of that basketball game, while in the officials' dressing room, Strom and Bavetta had an altercation. This altercation stemmed from some disagreements between Strom and Bavetta concerning the refereeing in the first half of the game. Bavetta alleged that Strom grabbed him about the neck and attempted to choke him. Strom denied trying to choke Bavetta. He stated that he simply grabbed Bavetta's jacket. Minutes of Hearing, attached to defendant's answers to plaintiff's interrogatories ("Minutes"), Docket No. 14; Article in *Referee Magazine,* attached to defendant's response to plaintiff's second request for production of documents, Docket No. 21. The Strom-Bavetta incident was reported to the Commissioner of the National Basketball Association ("NBA"). In December, 1979, the Commissioner fined Strom $2,500 be-

cause of the incident. *See,* NABR decision, Appendix A to this Memorandum.

In March, 1981, an interview with Strom appeared in *Referee Magazine.* In that interview Strom discussed the Bavetta incident among many other topics.[1] On April 10, 1981, shortly after these articles appeared, Bavetta sent Richard G. Phillips, Esquire, General Counsel for the NABR, the letter attached to this Memorandum as Appendix B in which he requested that a grievance committee investigate the matter and prosecute Strom.

Shortly after the filing of this "charge" Darell Garretson, then Executive Director of the NABR, informed Strom by telephone that Bavetta had filed a grievance (Garretson Affidavit, ¶ 4). Mr. Garretson also discussed the grievance with Strom by telephone in June, 1981 and informed Strom that the NABR would be conducting grievance proceedings against him at the NABR's annual meeting to be held in September, 1981. *Id.*[2] No copy of the grievance was mailed, sent or given to Strom at that time.

The next contact between Strom and the NABR concerning the Bavetta charge occurred on September 21, 1981. Strom was informed that a hearing would be held on the Bavetta complaint three days later, on September 24, 1981. Edward Rush, an Executive Board member of the NABR, then handed Strom a copy of Bavetta's letter to Phillips.[3] Answer to Interrogatory No. 8, Docket No. 14. Thus, the charge was given to Strom over five months after it was filed.

The hearing was held on September 24, 1981. Minutes were kept of the grievance hearing by the NABR. Phillips asked Strom if he was going to have counsel represent him at the hearing and advised him that if he needed additional time to secure counsel the Executive Board of the NABR would accommodate him. Strom replied that he did not need an attorney and asked to proceed. Phillips asked Strom if he was prepared and if he had sufficient notice of the hearing and Strom replied that he had known about the complaint for some time and that earlier in the week he had been provided with a copy of the complaint. Strom was also advised by Phillips that he had a right to cross-examine any witness and had a right to call witnesses in support of his position. Phillips Affidavit, ¶¶ 3, 4, 5; Minutes.

At the hearing, Bavetta described the incident in Boston on November 29, 1979 and referred to the article in *Referee Magazine* which Bavetta claimed was critical of him and of the NABR's handling of the Strom-Bavetta incident. Strom testified and denied having attempted to choke Bavetta as Bavetta claimed. Strom called one witness who testified to what he had heard about the incident at Bavetta's wedding. *See,* Minutes.

At the conclusion of the meeting, the Executive Board of the NABR met, found Strom guilty and imposed a three-year period of probation. The exact terms of the probation were to be determined at a later time. Strom did not state either during the hearing or immediately thereafter that he had not received sufficient notice of the charges against him. Phillips Affidavit, ¶ 4. On March 3, 1982, the NABR issued a decision on the charges filed against Strom by Bavetta and imposed a three-year period of probation with certain stated terms and conditions.

## II. DISCUSSION

Section 101(a)(5) of the Act provides:

Safeguards against improper disciplinary action.—No member of any labor

---

1. It appears that another interview was also published in a second magazine, *see* Letter from Richard Bavetta to Richard Phillips, Appendix B to this Memorandum.

2. Although these conversations appear to be disputed by plaintiff, they must be assumed to have occurred for purposes of this motion.

3. There is a dispute as to whether the date of the hearing was written on the letter provided to Strom. That copy has not been supplied to the court. The court will assume Strom's copy contained the date notation as contended by defendant.

organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing....

29 U.S.C. § 411(a)(5). The requirement of "written specific charges" means charges "specific enough to inform the accused member of the offense that he has allegedly committed." *Int'l. Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233, 245, 91 S.Ct. 609, 616, 28 L.Ed.2d 609 (1971).[4] "The notice must be so drafted as to inform a member with reasonable particularity of the details of the charges." *Berg v. Watson,* 417 F.Supp. 806 (S.D.N.Y.1976), *quoting, Jacques v. Local 1418, Int'l. Longshoremen's Ass'n.,* 246 F.Supp. 857 (E.D.La.1965). *See also, Reilly v. Sheet Metal Workers Ass'n.,* 488 F.Supp. 1121 (S.D.N.Y.1980); *Gleason v. Chain Service,* 300 F.Supp. 1241 (S.D.N.Y.1969), *aff'd,* 422 F.2d 342 (2d Cir. 1970); *accord, Semancik v. United Mine Workers,* 466 F.2d 144 (3d Cir.1972). Strom avers that the NABR failed to comply with this statutory requirement. For the reasons set forth below, the court concludes that as a matter of law, Mr. Strom was not afforded written specific notice of the charges against him prior to the imposition of discipline by the Association.[5]

The Union claims that its discipline of Strom was pursuant to its By-Laws, sections 13.3.1, 13.3.3 and 13.3.4.[6] The only

written notice of the charges received by Strom was a copy of the April 10, 1981 letter from Bavetta to Phillips. This letter stated that Bavetta was submitting a grievance in accordance with the Contract/Constitution—Article IX, Sections 3 and 4, that he was enclosing two articles he felt violated those provisions, and that

[I]n addition to the above, Earl Strom's conduct has caused severe emotional strain on me personally, my family and friends. I also feel that Mr. Strom's actions have been detrimental to the best interests of basketball, to the National Association of Basketball Referees and to me, a member of the association.

■ Article IX, §§ 3 and 4, referred to in Bavetta's letter, are provisions of the collective bargaining agreement between the NBA and the NABR stating that every referee must abide by all requirements of the NBA regarding conduct of its referees, that the Commissioner may impose fines for violations of such requirements and that any fine imposed is final and binding. There is absolutely no reference in either the letter or the contract sections cited therein to any provisions of the Union's Constitution or By-Laws.

■ A union may discipline its members for offenses not proscribed by written rules, *Hardeman, supra;* therefore, that the notice provided to Strom contained no reference to these provisions may not be disposi-

---

**4.** *Quoting,* Labor-Management Reform Legislation, Hearings Before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess. pt. 5, p. 2285 (1959).

**5.** In reaching this determination, the court is mindful of its duty not to scrutinize union regulations to determine whether particular conduct may be punished. *Int'l. Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233, 245, 91 S.Ct. 609, 616, 28 L.Ed.2d 609 (1971).

**6.** Sections 13.3.1, 13.3.3 and 13.3.4 of the Union's By-Laws provide:

*13.3.1.* Every member by virtue of his membership in this Association is obligated to abide by these By-Laws and this constitution with respect to his rights, duties, privileges and immunities conferred by them. Each member shall faithfully carry out such duties and obligations and shall not interfere with the rights of fellow members ....

*13.3.3.* Each member and officer shall adhere to the terms and conditions of pertinent collective bargaining agreements and shall refrain from any conduct that will interfere with the performance by this Association of its legal or contractual obligations.

*13.3.4.* No member shall engage in dual unionism or espouse dual unionism or disaffiliation nor shall any member slander or libel the Association, its members or its officers, or be a party to any activity to secure the disestablishment of the Association as the collective bargaining agent for any employee.

tive.[7] But the Union still must comply with the requirement of § 101(a)(5)(A) that the member be provided with charges specific enough to inform him of whatever the offense he allegedly committed. *Hardeman, supra* at 245, 91 S.Ct. at 616. What is determinative here is that the notice was unclear and therefore inadequate as to the nature of the charges.

The notice first contains a reference to two magazine articles which were sent to the Association but not provided to Strom together with the charges and a reference to the finality provisions of the NABR contract. Next the notice simply refers to Strom's "conduct" as having caused an emotional strain on Bavetta and being detrimental to the interests of basketball. Strom received this notice almost two years after the alleged assault and six months after the interviews; yet there is no further explanation of what conduct is being charged—the assault, the interviews, both, or something else.

The letter could be interpreted as giving notice of any or all of the following charges: that the interviews violated the finality provisions of the NBA agreements; that either the articles or some other unspecified conduct caused an emotional strain on Bavetta; that either the articles or some other unspecified conduct was detrimental to the game of basketball and to the Association. There is no reference in the letter to a "pattern of conduct aimed at the destruction of Richard Bavetta's effectiveness as a referee," the infraction that the Board of Directors ultimately found or any explanation of exactly what conduct comprised this pattern of conduct. The hearing focused on the details of the alleged assault; Bavetta also referred to the interviews and stated that he had a terrible year after the incident because Strom had told so many people in basketball that Bavetta had made up the story. *See,* Minutes.

Because the letter was vague as to the conduct being charged, even when considered· in the context of the events that transpired, it was inadequate as "written specific charges" under the LMRDA. The cases cited by defendant, *Perry v. Milk Drivers' and Dairy Employees Union,* 656 F.2d 536 (9th Cir.1981), *Vars v. Int'l Brotherhood of Boilermakers,* 215 F.Supp. 943 (D.Conn.1963), and *Null v. Carpenters District Council,* 239 F.Supp. 809 (S.D.Tex. 1965), are distinguishable because in those cases the charges were more specific with regard to the conduct at issue.[8]

---

**7.** In *Semancik v. United Mine Workers,* 466 F.2d 144, 157 (3d Cir.1972), the Court of Appeals held that to comply with the requirements of due process and § 101(a)(5)(A), a union's discipline must be limited to constitutional provisions and by-laws which reasonably inform the member of the nature of the proscribed activity. *Semancik,* however, involved an alleged violation of the § 101(a)(2) free speech provision, which the court stated was not subject to the same prohibition on review by the courts. *Id.* 153. The court need not resolve whether the notice provided to Mr. Strom in this case was defective in that it failed to specify the provisions of the Constitution or By-Laws at issue because even aside from this, the notice failed to comply with § 101(a)(5)(A).

**8.** In *Perry, supra,* the member was charged with picketing and causing others to picket and with having threatened physical violence against two union officials. 656 F.2d at 537.

The charges in *Vars, supra* were:

(1) That the said Art Vars, on or about August 28, 1961 and at various times thereafter, caused to be circulated to the membership of Local Lodge 614 certain material containing false and erroneous information, said false and erroneous information being detrimental to the welfare and best interest of the International Brotherhood and Local Lodge 614, all of said conduct being in violation of Article XXI, Section 1(d) of the International Constitution and Article XII, Section 2 of the By-Laws of Local Lodge 614.

(2) That the said Art Vars, from June, 1960, through, to and including August, 1961, violated Article XI, Section 1(f) of the International Constitution and Article XIII, Sections 1 and 2 of the By-Laws of Local Lodge 614 by willfully and fraudulently submitting false pay and expense claims to Local Lodge 614.

215 F.Supp. at 945.

The charges in *Null, supra* were that:

He violated the By Laws of Carpenters District Council of Houston and Vicinity under 'Steward's Authority and Duties', page 8, section 1, by not properly examining credentials of a Member. He violated section 2, under the same heading, by not having each member or applicant sign the Steward's Report.

By his actions he permitted an Apprentice Member to work on the job every day for a

Defendant asserts that Strom should have been aware of the conduct being charged but that would not cure the deficiency in the notice. "The independent knowledge of the accused concerning the circumstances of his own wrongdoing ... will not excuse the defendant's failure to comply with the requirements of the Act." *Reilly, supra* at 1127. *See also, Gleason, supra* at 1253. Similarly, any oral conversations Strom may have had with Union officials concerning the charges, *see* Garretson Affidavit, ¶ 4, do not cure the deficiency since "[t]he Act unambiguously requires that charges be preferred in writing." *Reilly, supra* at 1126. The purpose of the § 101(a)(5)(A) requirement is to prevent any question concerning the nature of the information communicated. *Id.* 1127.

In *Berg, supra,* the court held that adequate written notice was not provided where the notice stated that a member, Berg, "refused to comply with an order given him by ... a Business Agent...." Although the notice stated the date of the alleged infraction, it failed to specify the content of the order or the place where the order was given. Shortly before the hearing, Berg was able to obtain this information from a union official. In holding this notice inadequate under the Act, the court specifically rejected the argument that Berg was not prejudiced by any insufficiency of the notice because he was aware of the basis of the charges.

The NABR maintains that even if the notice itself was inadequate under the Act, Strom had waived his right to receive more specific charges. It relies on the affidavit of Richard G. Phillips, General Counsel to the Association, that:

4. I asked him if he was prepared and whether he had sufficient notice. Strom stated that he had known about the complaint and the charge for some time, that he knew what the charges were all about, that he did not want or need an attorney,

and that he wanted to get the case over with then.

5. After Strom asked to go forward with the hearing at that time, I informed him that he had the right to cross-examine any witnesses, and that he had a right to call witnesses in support of his position. At no time during or immediately after the hearing did Strom suggest that he had not been sufficiently notified of or prepared to defend the charges against him, or that he had in any way been surprised by the matters considered at the hearing.

Accepting this as we must on this motion for summary judgment, we do not agree with defendant that Strom therefore waived his right to specific charges in writing.

In *Ritz v. O'Donnell,* 566 F.2d 731 (D.C. Cir.1977), cited by defendant, the court held that the plaintiff waived his right to confrontation and cross examination where the Hearing Board had repeatedly stated that plaintiff had the right to call for the appearance of the charging parties and to examine them and each time plaintiff indicated he was not making such a request. The court stated that: "union members who knowingly fail to exercise rights guaranteed or offered them in connection with union disciplinary proceedings have waived those rights." *Id.* 735.

The situation here, however, is very different from *Ritz.* Even according to defendant, Strom was asked only whether he had received "sufficient notice," Phillips Affidavit, ¶ 4, not whether he wished to have specific written charges. His statement in response to this question, that he had known about the complaint and charges for some time, that he knew what the charges were about and that he wanted to get the case over with does not constitute a waiver of the § 101(a)(5)(A) right. Perhaps

period of approximately eight months and became approximately five and one-half months delinquent in dues.

This occurred [*sic*] on the Motel job located at Main and Franklin Streets, Houston, Texas,

for Manhattan Construction Company, General Contractor. This offense continued from September 1961 through approximately the month of February 1962.
239 F.Supp. at 812.

the response demonstrates that Strom had independent knowledge of the matter; but as discussed above, independent knowledge of the general nature of the accusations is irrelevant to the requirement that written specific charges be provided. Were the court to hold that Strom has waived his right under these circumstances, a union could routinely fail to provide notice that complied with § 101(a)(5)(A), then at the hearing simply inquire whether the member had received "adequate notice" and circumvent the congressional requirement of written specific charges.

The decision of the Association imposed discipline for engaging in a pattern of conduct aimed at the destruction of Bavetta's effectiveness as a referee, and in so doing, bringing disgrace and disrepute to his profession and to the Association. Neither the letter from Bavetta to Phillips, the Minutes nor the Affidavit of Phillips refer to notice of any such charges. The written notice of the charges was unclear; therefore, asking Strom only "if he was prepared and whether he had sufficient notice" could not remedy the deficiency. A reasonable person could not have intelligently determined if that notice or subsequent oral notice was adequate. Failure to explicitly state the actual charges makes inquiring whether a member had adequate notice of them meaningless. It is not the member's responsibility to clarify the charges against him; it is the duty of the union to provide its member with specific written charges. *Magelssen v. Local Union No. 518*, 233 F.Supp. 459 (W.D. Mo.1964).

## III. CONCLUSION

Therefore, because Strom was not provided with written specific charges in accordance with LMRDA § 101(a)(5)(A), and there was no valid waiver of that right, the discipline imposed by the NABR is null and void.[9]

9. Because of this holding, it is not necessary to address Strom's other arguments that he also was denied an adequate time to prepare his

Appendix A

THE NATIONAL ASSOCIATION OF BASKETBALL REFEREES

THREE GIRARD PLAZA ● SUITE 2106 ● PHILADELPHIA ● PA ● 19102 ● 215–567–4896

DECISION

IN RE: *The Complaint of Richard Bavetta against Earl Strom*

The Board of Directors of the National Association of Basketball Referees, having heard all the testimony along with arguments from both sides and having carefully reviewed said testimony, hereby unanimously find as follows:

That Earl Strom's testimony in this matter lacked credibility. (Note: in this regard our finding is consonant with that of Commissioner Lawrence O'Brien.)

That Earl Strom has engaged in a pattern of conduct aimed at the destruction of Richard Bavetta's effectiveness as a professional referee. Further, that in so doing, Mr. Strom has brought disgrace and disrepute to his profession and to the Association in which he presently enjoys membership.

Mr. Strom's repeated breach of his obligations to fellow members as well as his obligation to the Association is willful and deliberate and therefore demands the imposition of a most severe penalty.

However, in light of the fact that the National Basketball Association has fined Mr. Strom $2,500 for his conduct in an incident involving Mr. Bavetta, which incident lies at the threshold of the conduct complained of herein, it is hereby resolved that Earl Strom shall serve a period of probation in this Association for three years, during which, should he be found to be in further violation of this Association's Rules and By-laws, he shall face penalties, including, but not limited to, substantial fine and even expulsion from the Association.

defense and that the discipline was imposed in violation of his right to free speech under § 101(a)(2) of the Act.

APPENDIX A—Continued

The terms and conditions of the probation, which shall remain in effect for the entire 3 year period, are as follows:

a) Earl Strom shall not be eligible to attend any NABR meetings;

b) Earl Strom shall not be eligible to vote on any NABR matters; and

c) Earl Strom shall not be eligible to participate in NABR sponsored tours.

As to the foregoing, Jack Madden, Paul Mihalak, Ed Rush, Hubert Evans, Wally Rooney, and Mike Mathis all concur. Joseph Gushue concurs in all matters contained herein with the exception of voting eligibility, which he feels should be restored after one year.

The period of this probation is to run from January 1, 1982 through December 31, 1984.

/s/ Jack Madden

JACK MADDEN
Executive Director
National Association of
Basketball Referees

Appendix B

April 10, 1981

Mr. Richie Phillips
National Association of Basketball Referees
Three Girard Plaza
Suite 2106
Philadelphia, Penna. 19102

Dear Mr. Phillips:

Being a current dues paying member of the National Association of Basketball Referees and in accordance with our Contract/Constitution—Article IX—Sections 3 & 4, I submit to you my grievance with Earl Strom.

As evidence I have enclosed two magazines, Basketball Digest and Referee which contain data I feel has violated the above mentioned Article and Sections.

In addition to the above, Earl Strom's conduct has caused severe emotional strain on me personally, my family and friends. I also feel that Mr. Strom's actions have been detrimental to the best interests of basketball, to the National Association of Basketball Referees and to me, a member of the association.

I request that our grievance committee investigate this matter and prosecute to the fullest extent.

Please advise me of your findings.

Very truly yours,
/s/ Richard W. Bavetta
Richard W. Bavetta

RWB
Encl.