NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3619
_____

CAMICO MUTUAL INSURANCE CO.

v.

HEFFLER, RADETICH & SAITTA, L.L.P.,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. 2-11-cv-04753)
District Judge:  Honorable Jan E. DuBois
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 8, 2014

Before:  FISHER, JORDAN and HARDIMAN, *Circuit Judges*.

(Filed: October 10, 2014)
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Heffler, Radetich & Saitta, L.L.P. ("Heffler") appeals the district court's grant of

summary judgment to CAMICO Mutual Insurance Company ("CAMICO") and denial of

Heffler's cross-motion for partial summary judgment regarding an insurance coverage

dispute. For the reasons stated below, we will affirm.

I.

We write principally for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts that are necessary to our analysis.

CAMICO and Heffler entered into a claims-made Accountants Professional Liability Insurance Policy that was in effect from January 23, 2008 to January 23, 2009. This policy provided insurance for claims brought against Heffler, an accounting firm that, among other tasks, distributes settlement funds to claimants in class action suits. The policy insured both Heffler and others, including former Heffler employees.

In 2002, the Eastern District of Missouri approved a $490 million settlement in a class action against BankAmerica Corporation. Heffler was appointed by the court as the claims administrator, and Christian Penta, a senior claims analyst at Heffler from 2001 to 2004, was assigned to help administer the settlement. Heffler was paid for the work Penta performed and for other services it provided. Penta, while employed at Heffler and afterwards, defrauded three separate class actions, including the BankAmerica class action, of tens of millions of dollars by working with co-conspirators to file false claims.

Penta took a number of actions to further the fraud. He had his co-conspirators deliver their fraudulent claims directly to him so that he could ensure the claims were timely processed and approved for payment. In addition, he personally approved the fraudulent claims or otherwise ensured that the claims were approved by other Heffler

employees. Penta did not pocket the proceeds of these claims directly; rather, he was later given a portion of the fraudulently-obtained funds by the co-conspirators.[1] On September 11, 2008, Penta and his co-conspirators were charged with mail fraud and wire fraud. Penta pleaded guilty. Subsequently, David Oetting, a member of the BankAmerica class, brought a class-action suit against Heffler in the Eastern District of Pennsylvania seeking damages resulting from Penta's crimes. This suit was captioned *Oetting v. Heffler*. The suit alleged, among other claims, a breach of fiduciary duty, accountant malpractice, and negligent supervision.

Heffler notified CAMICO of its potential liability associated with Penta's actions on June 13, 2008, within the effective period of the CAMICO policy. CAMICO funded Heffler's defense, but subsequently advised Heffler that it reserved its right to recover costs and expenses relating to the defense that exceeded a $100,000 sub-limit in the policy concerning misappropriation, misuse, theft, or embezzlement. CAMICO later filed suit against Heffler with four causes of action: first, a declaratory judgment that CAMICO owed Heffler no defense or obligation beyond the $100,000 sub-limit; second, a claim for unjust enrichment; third, a claim for money had and received; and fourth, a claim for recovery of overpayment. Heffler, in response, filed counterclaims for a declaratory judgment that CAMICO's duty to defend and indemnify was not limited by the $100,000 sub-limit and for bad faith. The parties then filed cross-motions for

---

[1] Penta's indictment stated that for his role in the larger scheme, Penta received about 10% of the total fraud proceeds, or approximately $4 million.

3

summary judgment. The district court granted CAMICO summary judgment as to the declaratory judgment claim, the claim for money had and received, and the claim for recovery of overpayment. It further denied Heffler's cross-motion for partial summary judgment and entered a final judgment in favor of CAMICO. Heffler timely appealed.

## II.

The district court had jurisdiction under 28 U.S.C. § 1332(a)(1). This Court has appellate jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's order resolving cross-motions for summary judgment. *Tristani ex rel. Karnes v. Richman*, 652 F.3d 360, 366 (3d Cir. 2011). To determine whether summary judgment is appropriate, we apply the same standard as the district court. *Id.* Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

Heffler puts forward two arguments. First, it contends that the policy sub-limit for misappropriation, misuse, theft, or embezzlement does not apply. Second, it asserts that CAMICO is not entitled to recoup litigation costs from Heffler that are in excess of the sub-limit. Neither of these arguments is persuasive.

## A.

The district court held that CAMICO's defense and indemnification obligations in the *Oetting* action are capped by a policy sub-limit of $100,000. This sub-limit applies to

4

"*Damages* and *Claim Expenses* for each covered *Claim* arising from, related to or in connection with any *Insured's* misappropriation, misuse, theft or embezzlement of funds." J.A. 556. Former Heffler employees are considered an Insured when performing "*Professional Services* for the benefit of the *Named Insured* or a *Predecessor Firm* on or after the *Retroactive Date*." Heffler is the Named Insured. In concluding that the sub-limit applied, the district court recognized that Penta engaged in misappropriation, misuse, theft, or embezzlement of funds; that Penta was performing Professional Services for Heffler's benefit after the Retroactive Date; and that Penta was an Insured. We agree with each of these conclusions, which are beyond legitimate dispute on the record.

In interpreting an insurance contract, a court is "to ascertain the intent of the parties as manifested by the language of the written instrument." *Gene & Harvey Builders, Inc. v. Pa. Mfrs. Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co*., 469 A.2d 563, 566 (Pa. 1983)) (internal quotations marks omitted).[2] When a provision is ambiguous, "[it] is to be construed in favor of the insured and against the insurer . . . . Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Id.* (citation omitted).

We first look to the contract to determine whether Penta's conduct constitutes misappropriation, misuse, theft, or embezzlement of funds. "[A] court construes [w]ords

---

[2] The parties agree that Pennsylvania law applies to this contract. J.A. 10.

of common usage [in a contract] . . . according to their natural, plain, and ordinary sense." *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 293 (3d Cir. 2012) (second alteration in the original) (internal quotation marks omitted). On the other hand, "if technical words are used, they will be construed in their technical sense unless a contrary intention clearly appears." *Blue Anchor Overall Co. v. Pa. Lumbermens Mut. Ins. Co.*, 123 A.2d 413, 415 (Pa. 1956).

Misappropriation, theft, and embezzlement are technical words with specific legal meanings, while misuse is a word of common usage. After an extended discussion of the technical and common meanings of these words, the district court held that Penta's behavior satisfied the definition of each of those terms. For example, it defined misappropriation as "[t]he application of another's property or money dishonestly to one's own use." J.A. 15 (citing *Black's Law Dictionary* 1019 (8th ed. 2004)). The underlying Amended Complaint in the *Oetting* action shows that Penta approved false claims submitted by Penta and his co-conspirators. These claims funneled funds to which class members were entitled to Penta and his co-conspirators instead. This is the "application of another's . . . money dishonestly to one's own use." Penta at least misappropriated funds, behavior sufficient to invoke the applicable sub-limit.[3]

Next, we must determine whether Penta was performing Professional Services for the benefit of Heffler. Professional Services are "any professional services performed by

---

[3] We note, without deciding, that Penta may have also engaged in misuse, theft, or embezzlement, as the district court decided.

6

an *Insured* as long as the fees or commissions, if any, or other benefits from such services inure to the benefit of [Heffler]." J.A. 560. Assuming for the moment that Penta was an Insured, Heffler's sole argument that Penta's actions were not Professional Services is that none of the fees, commissions, or other benefits derived from the actions Penta took in furtherance of the fraud scheme inured to the benefit of Heffler. This view is far too narrow. If this were in fact the case, it is hard to imagine a situation in which the sub-limit at issue would apply. Whenever an employee was engaged in independent criminal conduct of this type—the benefits of which by definition would not inure to Heffler—he would immediately move outside the ambit of the contractual sub-limit applicable to an employee's misappropriation, misuse, theft, or embezzlement of funds.

This narrow interpretation would thus render the provision at issue superfluous. "[N]o provision of a contract should be treated as surplusage or redundant if any reasonable meaning consistent with other parts of the agreement can be given to it." *Wyo. Valley W. Sch. Dist. v. Nw. Sch. Dist.*, 695 A.2d 949, 953 (Pa. Commw. Ct. 1997). There is another reasonable meaning of this provision consistent with the entirety of the agreement that does not render it surplusage. We agree with the district court that "the sub-limit provision applies to employees who engage in misappropriation, misuse, theft, or embezzlement of funds in connection with their employment for Heffler, and who are providing benefits to Heffler through their general employment." J.A. 20. As explained above, Penta at least engaged in misappropriation. In addition, neither party contends that

7

Penta was not employed by Heffler, nor do they contend that his general employment did not provide benefits to Heffler. Thus, because Penta was engaged in the professional service of claims administration at the time that he was employed by Heffler, and the benefits of this claims administration inured to Heffler, Penta performed Professional Services as defined by the insurance policy.

Finally, we examine the contract to assess whether Penta qualified as an Insured under the policy. The insurance policy states that "[e]ach of the following *Persons* is an *Insured*, but only while performing *Professional Services* for the benefit of the *Named Insured* or a *Predecessor Firm* on or after the *Retroactive Date*: . . . [a] current or former . . . employee of a *Named Insured*." J.A. 557-58. Penta, as both sides acknowledge, is a former employee of Heffler. The parties disagree, however, as to what the "only while performing *Professional Services*" language means. There is thus very little in dispute, and a short explanation of insurance policies will clarify the disagreement.

There are two general types of insurance policies: claims-made policies and occurrence policies. "A claims made policy, as opposed to an occurrence policy, protects the policy holder against claims made during the life of the policy, rather than against occurrences which happen during the policy period and for which claims may arise later." *Twp. of Ctr., Butler Cnty., Pa. v. First Mercury Syndicate, Inc.*, 117 F.3d 115, 118 (3d Cir. 1997) (internal quotation marks omitted). The policy at issue is a claims-made policy. J.A. 553. Thus, under the terms of the policy, CAMICO was obligated to insure

8

claims made during the policy period if the conduct underlying those claims was undertaken by a former employee, such as Penta, while performing Professional Services. Heffler argues that Penta did not work for Heffler, and therefore was not performing Professional Services for Heffler, at the time the claim was made. It contends that Penta therefore was not an Insured when the claim was made. This argument is unavailing—the plain language of the contract dictates otherwise. The terms of the policy state that former Heffler employees are considered Insureds while performing Professional Services for Heffler's benefit after the Retroactive Date. Penta's conduct was certainly performed after the Retroactive Date of January 1, 1943. Both parties agree on this point. In addition, as discussed above, his conduct qualifies as Professional Services. We hold that Penta's status as an Insured is determined at the time the conduct in question occurred, and that he is therefore an Insured to whom the sub-limit applies.

C.

The district court further held that CAMICO is entitled to recoup its litigation costs from Heffler in excess of the sub-limit. As such, it awarded CAMICO $87,531.76 in fees and costs incurred in defending the underlying *Oetting* action. We agree with the district court.

In Pennsylvania, insurers normally may not recoup costs expended in defense of an insured party. "[A]n insurer is not entitled to be reimbursed for defense costs absent an express provision in the written insurance contract." *Am. & Foreign Ins. Co. v. Jerry's*

9

*Sport Ctr., Inc.*, 2 A.3d 526, 529 (Pa. 2010). This is only the case, however, "[w]here the insurance contract is silent about the insurer's right to reimbursement of defense costs." *Id.* at 544. Thus, reimbursement is possible when a contract expressly provides for it.

In the instant case, the insurance contract provides that "[i]f [CAMICO] pays any *Claim Expenses* or *Damages* . . . in excess of the applicable Limit of Liability, [Heffler] shall reimburse [CAMICO] these amounts within thirty (30) days of [CAMICO's] request." J.A. 557. This is an "express provision in the written insurance contract," *Am. & Foreign Ins. Co.*, 2 A.3d at 526, within the scope of Pennsylvania precedent. The plain language of the contract states that Heffler is obligated to reimburse CAMICO if CAMICO pays expenses or damages in excess of any applicable sub-limit. Because we will affirm the district court's ruling that the $100,000 sub-limit applies, Heffler is obligated to reimburse CAMICO, and we will affirm the district court's award of litigation costs and fees.

IV.

For the reasons set forth above, we will affirm the order of the district court.